FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ MAR 1 2 2009 ★

BROOKLYN OFFICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **NEW MEXICO UFCW UNION'S AND EMPLOYERS' HEALTH AND WELFARE TRUST FUND** on behalf of itself and all others similarly situated, | CIVIL ACTION NO. _____ **09 1033** GLEESON, J. |
| **Representative Plaintiff,** | J. ORENSTEIN, M.J. |
| v. | **CLASS ACTION COMPLAINT** |
| **FOREST LABORATORIES, INC., FOREST PHARMACEUTICALS, INC., PFIZER, INC., and WARNER LAMBERT COMPANY,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

New Mexico UFCW Union's and Employers' Health and Welfare Trust Fund ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against Forest Laboratories, Inc., Forest Pharmaceuticals, Inc. (collectively "Forest"), Pfizer Inc. ("Pfizer"), and Warner-Lambert Company ("Warner-Lambert"), (collectively referred to as "Defendants"). Plaintiff's allegations are based upon personal knowledge as to matters relating to themselves and upon the investigation of counsel and information and belief as to all other matters.

### I.    INTRODUCTION

1.    This proposed national class action alleges that from 1998 through at least 2005 Defendants engaged in a widespread campaign to illegally market two related antidepressant drugs, Celexa and Lexapro, for off-label use in pediatric patients when both products had been approved only for adult use. During much of that time, Defendants misled physicians and the medical

1

community at large, by promoting the results of a positive study on pediatric use of Celexa while failing to disclose the negative results of a contemporaneous study for the same pediatric use. The contemporaneous study found Celexa no more effective than a placebo, yet more young patients taking Celexa attempted suicide or reported suicidal ideation than those taking only placebo. The suppressed study was later relied upon by the FDA in its decision to mandate that Forest add a "black box" warning to both Celexa and Lexapro labels, cautioning against pediatric use. In furtherance of its off-label marketing scheme, Defendants developed and executed a sophisticated marketing campaign touting pediatric use of the drugs while failing to disclose known negative data pointing towards risks in juveniles. This fraud was compounded by a rampant scheme to induce doctors to become high prescribers through various forms of illegal remuneration, including cash payments disguised as grants or consulting fees, expensive meals and lavish entertainment, and other valuable goods and services. Throughout and possibly beyond these seven years of fraud, until federal regulators, the scientific community and the public caught up with Defendants' misconduct, consumer and third-party payors had paid for millions of unnecessary Celexa and Lexapro prescriptions costing hundreds of millions, if not billions, of dollars.

## II.    PARTIES

2.    Plaintiff, New Mexico UFCW Union's and Employers' Health and Welfare Trust Fund ("NMUFCW") is a Taft-Hartley fund with its principle place of business in Albuquerque, New Mexico. Plaintiff NMUFCW has purchased, reimbursed and or paid for Celexa and/or Lexapro during the period between 1998 through the present and has suffered damages as a result of Defendants' illegal and wrongful conduct alleged herein.

3.      Defendant Forest Laboratories, Inc. is a pharmaceutical company organized under the laws of Delaware with its principle place of business in New York, New York. Forest Laboratories, Inc. has a license from H. Lundbeck A/S ("Lundbeck"), a Danish company, to promote and sell Celexa and Lexapro in the United States.

4.      Defendant Forest Pharmaceuticals, Inc. is a wholly owned subsidiary of Forest Laboratories, Inc. with its principle place of business in St. Louis, Missouri. Forest Pharmaceuticals, Inc. manufactures, distributes, and sells Forest prescription products in the United States.

5.      Defendant Pfizer is a Delaware corporation maintaining its principal place of business in New York.  In 2001, Pfizer, Inc. merged with Warner-Lambert and created the present day company. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States.

6.      Defendant Warner-Lambert was acquired in June 2000 by Pfizer. This acquisition included Warner-Lambert's Parke-Davis division ("Parke-Davis"). Prior to the acquisition, Warner-Lambert was a Delaware corporation that maintained its principal place of business at 201 Tabor Road, Morris Plains, New Jersey. Warner-Lambert was engaged in marketing, advertising, promoting, co-promoting, distributing and/or selling Celexa and Lexapro in the United States during the relevant time period pursuant to a co-promotion agreement with Forest.

### III.      JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (d)(2), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which "any member of a class of Plaintiffs is a citizen of a state different from any

defendant." Jurisdiction also rests under 28 U.S.C. § 1331 because Counts I and II arise under the laws of the United States, and under 28 U.S.C. § 1367 because the state law claims are supplemental to the federal causes of action.

8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) because Defendant does business in this District and because a substantial portion of the improper conduct took place in this District.

9.      Plaintiff has timely filed this action.  Applicable tolling provisions apply.

## IV. FACTS

**The Celexa and Lexapro Labels**

10.     Celexa (citalopram) and Lexapro (escitalopram) are closely related serotonin reuptake inhibitor ("SSRIs") drugs.  Lundbeck developed both Celexa and Lexapro, which contains the active agent in Celexa, and subsequently licensed both drugs to Forest for marketing in the United States. Forest began selling Celexa in September of 1998.  In September of 2002, with Celexa soon due to face generic competition, Forest began selling Lexapro.

**The Warner Lambert Co-promotion Agreement**

11.     On March 27, 1998, Forest entered into a co-promotion agreement with Warner-Lambert wherein Celexa would be jointly promoted by Forest and Parke-Davis.

12.     The term of the agreement was three years upon commencement of physician detailing by the sales forces of Parke-Davis and Forest, followed by a residual period of an additional three years.  Under the agreement, Forest was to pay Parke-Davis a share of the annual profits earned on Celexa's sales.

13. Warner-Lambert and Parke-Davis worked with Forest to develop and execute marketing plans for Celexa's introduction into the United States market and its promotion. Warner-Lambert and Parke-Davis agreed to provide 40% of the volume of sales calls, or "details" to physicians targeted for Celexa sales.

14. Warner-Lambert and Parke-Davis's management and sales force coordinated with Forest to enact the off-label scheme described herein.

15. In anticipation of the Warner-Lambert merger with Pfizer, the Defendants terminated the Celexa co-promotion agreement in 2000.

**The FDA Has Not Approved Celexa Or Lexapro for Pediatric Use**

16. In 1998, the FDA approved Celexa for the treatment of adult depression. The FDA never approved Celexa for treatment of any conditions other than adult depression, or for any pediatric use.

17. In 2002, the FDA approved Lexapro for the treatment of adult depression. In 2003, Lexapro received approval for treatment of Generalized Anxiety Disorder ("GAD") in adults. Lexapro has not been approved for any other conditions and was not approved for any pediatric use.

18. The use of Celexa and Lexapro in pediatric patients is not supported by a citation included or approved for inclusion in any compendia. The use of Celexa and Lexapro in pediatric patients in not a "medically accepted" indication for those drugs.

19. If a manufacturer conducts pediatric clinical studies on a drug, a manufacturer may obtain an additional six months of patent exclusivity for the previously-approved, on-label indications for that particular drug, subject to certain FDA requirements. 21 U.S.C. § 355a. In such

circumstances, the FDA issues a "Written Request" that details the studies that should be performed. 21 U.S.C. § 355a(c)(2)(A).

20.     In August 1998, Forest submitted a "Proposed Pediatric Study Request for Celexa." On April 28, 1999, the FDA issued a written request for Forest to conduct "two independent, adequate and well-controlled clinical trials in pediatric depression" for Celexa.

21.     On September 24, 1999, Forest submitted to the FDA protocols for two pediatric studies: 1) a double-blind, placebo-controlled pediatric study being conducted in Europe by Lundbeck (the "Lundbeck study"); and 2) a double-blind, placebo-controlled pediatric study to be conducted in the United States by Forest through University of Texas child psychiatrist Karen Wagner (the "Wagner study").

22.     In mid-2001, the Wagner and Lundbeck studies were unblinded and their results were disseminated to senior Forest executives.  The Wagner study was positive, i.e., it indicated that Celexa was more effective than placebo in treating pediatric patients suffering from depression, but the Lundbeck study was negative, i.e., it did not show Celexa to be any more effective than placebo in treating pediatric depression.  Furthermore, in the Lundbeck study, 14 of the patients taking Celexa attempted suicide or reported suicidal ideation (i.e., contemplation of suicide) compared to only five patients taking placebo.  Under one statistical test, this result was "significant," while under another statistical test, it was "borderline significant."

23.     On April 18, 2002, Forest submitted the results of both the Lundbeck and Wagner studies to the FDA in support of requests for both a six-month extension of patent exclusivity and a pediatric indication for Celexa.  Forest's submission to the FDA was not public.

6

24.     On July 15, 2002, the FDA granted Celexa six additional months of patent exclusivity for the on-label use of treating depression in adults.

25.     On September 23, 2002, the FDA denied Forest's request for a pediatric indication for Celexa.  The FDA concluded that the Lundbeck study "is a clearly negative study that provides no support for the efficacy of citalopram in pediatric patients with [major depressive disorder]."

## The FDA-Mandated Black Box Warnings on the Celexa and Lexapro Labels

26.     On March 22, 2004, the FDA issued a public health advisory requesting that certain SSRI manufacturers, including Forest, change the labels on their SSRI drugs to include "a [w]arning statement that recommends close observation of adult and pediatric patients treated with these agents for worsening depression or the emergence of suicidality."

27.     Later that year, the FDA directed the SSRI manufacturers, including Forest, to include on their labels a black box warning and expanded statements to alert physicians about the potential for increased risk of suicidality in children and adolescents taking SSRIs.  The black box warning specifically stated that "[a]ntidepressants *increased the risk* of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disorders." (Emphasis added).  In addition, the FDA required SSRI manufacturers to state, in relevant part, that:

> The risk of suicidality for these drugs was identified in a combined analysis of short-term (up to 4 months) placebo-controlled trials of nine antidepressant drugs, including the selective serotonin reuptake inhibitors (SSRIs) and others, in children and adolescents with Major Depressive Disorder (MDD), obsessive compulsive disorder (OCD), or other psychiatric disorders.  A total of 24 trials involving over 4400 patients were included.  The analysis showed a greater risk of suicidality during the first few months of treatment in those receiving antidepressants.

28.     The Lundbeck study on pediatric use of Celexa was one of the 24 trials considered by the FDA in mandating this warning.

29.     Forest revised the Celexa and Lexapro labels in early 2005 to include the required black box warning and to state under each label's "Pediatric Use" subheading that "[s]afety and effectiveness in the pediatric population have not been established (see BOX WARNING and WARNINGS-Clinical Worsening and Suicide Risk)." The Celexa label further stated that "[t]wo placebo-controlled trials in 407 pediatric patients with MDD have been conducted with Celexa, and the data were not sufficient to support a claim for use in pediatric patients."

30.     In 2007, the Celexa and Lexapro labels were again modified to state that, after evaluating the pooled analyses of placebo-controlled SSRI trials in children and adolescents and of trials in adults, "[t]here was considerable variation in risk of suicidality among drugs, but a tendency toward an increase in the younger patients for almost all drugs studied."

31.     To date, Forest has not obtained FDA approval for a pediatric indication for Celexa or Lexapro. Both the Celexa and Lexapro labels currently include black box warnings explicitly indicating that the safety and efficacy of the drugs in the pediatric population have not been established.

**Forest's Dissemination Of Half Truths As A Result Of Its Failure To Disclose The Results Of The Negative Lundbeck Study**

32.     Although Forest submitted the Lundbeck study to the FDA in 2002 in order to seek a six-month extension of patent exclusivity for Celexa (which Forest later valued at $485 million), Forest failed otherwise to disclose the negative study beyond a small group of its senior executives.

At the same time, Forest aggressively promoted the Wagner study, thereby relaying the false impression that the only available pediatric data on Celexa was positive.

33.     Although the Forest senior executives learned about the negative Lundbeck results in mid-2001, Forest failed for the next three years to disclose that negative data to, amongst others: its thousands of sales representatives who were detailing pediatric specialists; pediatric specialists whom it hired to give promotional speeches on Celexa and Lexapro; the members of its Executive Advisory Board of leading psychiatrists upon whom it ostensibly relied for advice concerning new data and upon whom it also relied to convey information to others; its own Professional Affairs Department, which it charged with disseminating "balanced" information in response to physician requests for available data on Forest drugs; or even its own pediatric researchers such as Dr. Wagner.

34.     During this same time period, Forest took aggressive steps to publicize the positive results of the Wagner study.  On August 27, 2001, Forest presented the Wagner study results to its Executive Advisory Board without making any mention of the contemporaneous negative Lundbeck results. Forest thereafter arranged for Dr. Wagner to present a poster summary of the Wagner study to various professional groups, including the American Psychiatric Association, the American College of Neuropsychopharmacology, and the Collegium Internationale Neuro-Psychopharmalogicum. In conjunction with these presentations, Forest coordinated the "placement" of news stories about the positive Wagner data in numerous national and local media outlets.

35.     Over the course of 2002, Forest arranged for Dr. Wagner to give promotional presentations on the pediatric uses of Celexa and to serve as the chair of a seven-city Continuing Medical Education ("CME") program on treating pediatric depression.  Forest also sponsored 20 CME teleconferences that addressed the Wagner study results.

36.     Forest's simultaneous failure to disclose the negative Lundbeck study results and wide publication of the positive Wagner study results caused Forest and its consultants to make false or misleading statements.  For example, because not even Dr. Wagner was aware of the negative Lundbeck data, she never discussed that data in her many Forest-sponsored talks addressing the pediatric use of Celexa and Lexapro.  Her slide presentations addressed negative studies on pediatric use of other SSRIs, but falsely indicated that there were no negative studies on the pediatric use of Celexa.

37.     Forest's failure to disclose the negative Lundbeck results to the members of Forest's Executive Advisory Board caused those members to make false or misleading statements in promotional teleconferences on Celexa and Lexapro.  During the teleconferences, which were targeted to large numbers of physicians across the county, the Forest Executive Advisory Board members represented, based on the Wagner data, that Celexa was safe and effective for pediatric use even though, unbeknownst to them, the FDA had specifically rejected Forest's attempt to gain approval for such a claim because of the negative Lundbeck data.

38.     During details to physicians, Forest sales representatives made false or misleading representations by distributing off-label publications on the pediatric use of Celexa and Lexapro that did not include the negative Lundbeck data.  Forest sales managers, also unaware of the Lundbeck data, directed the dissemination of these publications.

39.     Forest had a Professional Affairs Department that responded to health care provider inquiries.  Under the company's own written policy, the Professional Affairs Department was:

> *Required to provide balanced information* to help the health care practitioner (HCP) make the best decision on behalf of the patient.  For this reason, *there is an ethical prohibition in "cherry picking" studies that are favorable to Forest products.*  The

Food and Drug Administration Division of Drug Marketing, Advertising, and Communications (DDMAC) monitors drug information departments to insure information provided to HCPs is balanced, and that it is not selective. (Emphasis added.)

Forest's failure to disclose the negative Lundbeck data to its Professional Affairs Department caused it to disseminate misleading information to physicians on the pediatric use of Celexa and Lexapro. When physicians sought information from Forest's Professional Affairs Department in the years following the un-blinding of the Wagner and Lundbeck studies, the Professional Affairs Department responded with letters that cited only positive data. The letters cited just one double-blind placebo-controlled trial on the use of Celexa to treat pediatric depression, the Wagner Study. The letter never mentioned that there was another, negative double-blind placebo-controlled trial, the Lundbeck study.

40.     Several senior Forest executives - including Lawrence Olanoff (then Forest's Chief Scientific Officer and now its President), Ivan Gergel (Vice President of Clinical Development and Medical Affairs), and Amy Rubin (Director of Regulatory Affairs) – reviewed the letters before the Professional Affairs Department disseminated them.  All of these senior Forest executives knew about the negative Lundbeck data.

41.     Forest paid a medical writing firm to ghost-write an academic article on the Wagner study, and Forest arranged to have the article published in the June 2004 issue of *The American Journal of Psychiatry*, with Dr. Wagner listed as the lead author. The article did not mention that the only other double-blind, placebo-controlled trial on pediatric use of Celexa had shown no efficacy and had an incidence of suicide attempts and suicidal ideation among those taking Celexa that was almost three times higher than in the group taking the placebo.

11

42.     On June 21, 2004, *The New York Times* published a news story titled "Medicine's Data Gap – Journals in a Quandary; How to Report on Drug Trials." The story featured *The American Journal of Psychiatry* article on the Wagner study, revealing the negative results of the Lundbeck study and noting that the Wagner article failed to mention them.

43.     Three days after the story ran, Forest issued a press release acknowledging the existence of the Lundbeck study and its finding that Celexa "did not show efficacy versus placebo." That same day, Forest also disclosed the results of an earlier double-blind, placebo-controlled study of Lexapro in children and adolescents. That study also failed to show efficacy in comparison to placebo.

44.     By failing to disclose the Lundbeck study results, which raised serious questions about the efficacy and safety of Celexa, while simultaneously promoting the Wagner study, Forest told prescribing physicians a half-truth and thereby prevented them and the public from having all potentially available information when making decisions about how to treat a serious medical condition in pediatric patients.

45.     Forest's conduct regarding the Lundbeck study results was consistent with the way it handled prior negative study data on Celexa. Just a few months before the pediatric Lundbeck study was unblinded, senior executives from Forest and Lundbeck discussed whether publicly to disclose the negative results from a study of Celexa in a primary care population. The study included three groups: patients taking Lexapro, patients taking Celexa, and patients taking placebo. Although Lexapro showed efficacy versus the placebo in the study, Celexa did not. Minutes of a December 2000 meeting of senior Forest and Lundbeck executives show that Forest wanted to publicize only the Lexapro versus placebo results, while Lundbeck wanted the results from the entire study to be

publicly disclosed. As Lundbeck executives noted a month earlier, "Forest made clear their concern over disclosing any data that could put Celexa in an unfavorable light." In May 2001, Lundbeck executives observed that "Forest are at the moment unwilling to release data where citalopram does not sufficiently surpass placebo." Forest ultimately prevailed over Lundbeck and, as it did later with Lundbeck's negative pediatric data, kept the negative Celexa versus placebo results confidential.

46.     Forest's off-label scheme paid off handsomely and its success was vital to the prosperity of the company. Celexa and Lexapro constituted Forest's antidepressant franchise, which was the backbone of the company's growing fortunes. These two drugs accounted for 68%, 74%, 82%, 77% and 69% of the Company's net sales for the fiscal years ending 2006, 2005, 2004, 2003 and 2002 respectively.

**Defendants' Fraudulent Course Of Conduct To Promote Celexa And Lexapro For Off-Label, Pediatric Use**

47.     To obtain FDA approval for a drug, a drug must be demonstrated to be safe and effective for each of its proposed uses. The approved uses for a drug are limited to those uses identified in the FDA-approved product label. *See* 21 U.S.C. § 355(a), (b). "Off-label" use refers to the promotion of an approved drug for any purpose, or in any manner, other than what is described in the drug's FDA-approved labeling.

48.     From 1998 through at least 2005, Defendants engaged in a widespread campaign to promote Celexa and Lexapro for pediatric use, even though neither drug was approved for pediatric use and the science was, at best, inconclusive about the safety and efficacy of these drugs for pediatric use. Forest and Warner-Lambert used sales representatives to detail or target pediatric specialists; paid pediatric specialists to give promotional speeches to other physicians on pediatric

13

use; selectively distributed publications on pediatric uses to pediatric specialists; misrepresented the safety and effectiveness of the drugs; and made extensive payments and gifts to induce physicians to prescribe Celexa and Lexapro for pediatric uses.

49.     As soon as Celexa was approved by the FDA, Forest distributed 175,000 bottles of Celexa of thirty tablets each, sufficient for one month's treatment, to 22,000 leading SSRI prescribers, including pediatricians, to encourage them to try the product on their patients.

50.     Defendants knew that its off-label promotion for pediatric use was unlawful. Shortly before the FDA ordered the black box warning in September 2004, a Forest executive testified before Congress: "I want to emphasize that, because the FDA has not approved pediatric labeling for our products, Forest has always been scrupulous about not promoting the pediatric use of our antidepressant drugs, Celexa and Lexapro. That is the law, and we follow it."  In fact, Forest had been illegally promoting the pediatric use of Celexa and Lexapro throughout the preceding six years, along with Warner-Lambert for the first two years.

51.     Defendants assigned sales representatives to specific geographic regions across the United States. Within each region, sales representatives encouraged specific doctors to increase their prescriptions of Celexa and Lexapro. A specific component of this marketing scheme included the promotion of Celexa and Lexapro for pediatric indications.

52.     From 1998 through the end of 2004, the lists of physicians whom Defendants directed their sales representatives to target, also known as "call panels," included thousands of child psychiatrists, pediatricians, and other physicians who specialized in treating children. Forest had more than 500,000 promotional sales calls or "details" with these pediatric specialists. The sales

14

representatives documented these details through "call notes."  Forest recorded thousands of call notes evidencing pediatric promotion.  Examples of such notes include the following:

- "discussed cx [Celexa] use in children ... and results of dr. karen wagner study regarding cx use for children and adolescents."

- "went over peds use, 0 drug interactions, less ae, less compliance issues for children, he is sold on that. closed on keeping cx first choice."

- "went over Celexa children, the invitation to the winery."

- "[doctor] trying in children and asked if [Lexapro] could be dissolved in water for children. Told him to crush and put in apple sauce.  Liked idea!"

- "discuss Lx [Lexapro] brief and what he [is] using dosing w children ... reinforce safety for children."

- "Let him know some child psychs are using LX for children."

- "Discussed children and adolescents with ADH[D] and how Lexapro fits in to treat the anxiety and depression and OCD."

- "dinner program [with child psychiatrist as speaker] at amato's with yale child study center."

- "focus on Lexapro efficacy at just 10mg..great choice for child/adolescents."

- "mainly sees children but always felt comfortable with CX & children -got his commitment to give [Lexapro] a fair clinical trial."

- "went over lxp use on children and efficacy."

Call notes such as these represent only some of the instances when sales representatives memorialized their illegal off-label promotion of Celexa and Lexapro.  The call notes exemplify the tip of what was a much more pervasive and widespread off-label campaign.

53.    Forest's headquarters office in New York maintained a list of "approved" promotional speakers that included numerous pediatric specialists.  Forest sales representatives and managers

identified speakers from these lists to organize promotional lunches and dinners on Celexa and Lexapro. As late as 2005, approximately 14% of Forest's 2,680 approved speakers were pediatric specialists. Many of the Forest promotional programs for Celexa and Lexapro explicitly focused on off-label pediatric use: the programs had titles such as "Adolescent Depression," "Adolescent Treatment of Depression," "Updates in Depression," "Depression," "Treatment of Child/Adolescent Mood Disorders," "New Treatment Options in Depressive Disorders in Adolescents," "New Age Depression Treatment," "Use of Antidepressants in Adolescents," "Benefits of SSRIs in Child Psychology," "Treating Depression and Related Illnesses in Children," "Adolescents, and Adults," "Celexa in CHP/Ped Practice," "Treating Difficult Younger Patients," "Treatment of Depression," "Assessment and Treatments of Suicidal Adolescents," and "Treating Pediatric Depression." Forest management approved each of these programs.

54.    From 1999 through 2006, one pediatric specialist, Dr. Jeffrey Bostic, Medical Director of the Massachusetts Child Psychiatry Access Project at Massachusetts General Hospital, gave more than 350 Defendant-sponsored talks and presentations, many of which addressed pediatric use of Celexa and Lexapro. Dr. Bostic's programs, which took place in at least 28 states, had topics such as "Uses of Celexa in Children" and "Celexa Use in Children and Adolescents." Forest also paid Dr. Bostic to meet other physicians in their offices in order to ease their concerns about prescribing Celexa or Lexapro off-label for pediatric use.

55.    Dr. Bostic became Defendants' star spokesman in the promotion of Celexa and Lexapro for pediatric use. As one sales representative wrote, "DR. BOSTIC is the man when it comes to child Psych!" Between 2000 and 2006, Forest paid Dr. Bostic over $750,000 in honoraria for his presentations on Celexa and Lexapro.

16

**Defendants' Illegal Inducements To Physicians To Prescribe Celexa And Lexapro**

56.     Defendants augmented their off-label promotion efforts through extensive payments and gifts to physicians to induce them to prescribe Celexa and Lexapro.  Forest's marketing department directed some of the kickbacks, such as honoraria for participation in advisory boards and in a large marketing study on Lexapro.  Forest's sales representatives, often acting with the knowledge and encouragement of their managers, arranged for other kickbacks, such as restaurant gift certificates for physicians, lavish entertainment of physicians and their spouses, and grants to individual physicians.

**Advisory Boards**

57.     Between 2000 and 2005, Defendants hosted over 900 local or regional "advisory boards" on Celexa and Lexapro, with over 19,000 advisory board attendees that Forest called "consultants."  Each "consultant" was paid an honorarium of $500.

58.     Ostensibly, Forest paid physicians to attend these advisory boards to get their feedback on the marketing of Celexa and Lexapro.  In reality, as repeatedly reported in internal company documents, Forest intended that the advisory boards induce the attendees to prescribe more Celexa and Lexapro.

59.     In a May 2000 proposal for a series of 44 Celexa advisory boards, a Forest contractor, Intramed, wrote that the advisory boards, each with 20 physicians attendees, would "give Forest an opportunity to influence more physicians."  Forest's marketing department approved this proposal.  Later that year, Steve Closter, the Forest marketing executive who organized the advisory boards, wrote that the Celexa advisory boards begun in June 2000 had been successful and, as a result, "will become an even larger part of the promotional mix in the future."  For years thereafter, Forest's

marketing department included the cost of advisory boards in its annual promotional budgets for Celexa and Lexapro.

60.     With the early success of the advisory board programs, the Forest sales force enthusiastically used them to drive up sales. As one Forest District Manager told his Regional Director in a November 2000 planning document, he intended to conduct a local advisory board to "target the highest prescribers" in several of his territories because "[t]here is no doubt that a program of this magnitude will increase Celexa market share." In approximately January 2002, a marketing strategy slide deck given to Forest's chief executive, Howard Solomon, quoted a Regional Director stating that, "[w]ell planned Advisory Board meetings will be key to our efforts of reaching hesitant physicians."

61.     In June 2002, Forest's two Vice Presidents of Sales sent a memorandum to all sales managers observing that, notwithstanding new promotional guidelines for the industry, advisory boards remained among "the wealth of activities and programs that we can conduct that will impact physicians." Similarly, in August 2002, a Forest Regional Director sent an e-mail to his District Managers stating that, "[w]ith the new guidelines in place, Ad Boards have become even a more valuable resource, thus each one needs to be a home run! With your attention and focus, we can make [sic] maximize this opportunity!"

62.     In the fall of 2002, to coincide with the launch of Lexapro, Forest conducted a series of 200 advisory boards reaching over 4,000 potential new Lexapro prescribers.

63.     Forest monitored its return on investment, or "ROI," from the advisory boards. To conduct its ROI analyses, Forest measured the increase in prescriptions written by physicians that attended the local advisory boards, and then compared the value of those prescriptions to the cost -

primarily the honoraria payments - of putting on the programs. A November 2000 ROI analysis of a single advisory board program reached the following conclusion:

> Post program the Ad Board group [24 attendees] wrote an average of 19.6% Celexa as measured by a 5-week 1st Rx average. This is an increase 00.7% in share. At first glance, the share increase might not appear substantial. However, considering the volume of SSRIs written by these physicians, 3.7% translates into almost 2000 new prescriptions on a yearly basis.

64.   In May 2001, an internal ROI analysis of all of the Celexa advisory boards in 2000 found that "participants in the program prescribed nearly 14 additional prescriptions of Celexa vs. the control group over a seven-month period."

65.   Three months later, in August 2001, the author of the ROI analysis reiterated to the Celexa marketing team that, "[O]ur goal is to increase the ROI on these advisory boards." That same month, a Forest Regional Director reported to the company's Vice President of Sales that three local advisory boards had "generated close to $30K" from just a subset of the attendees and that "the scripts will continue, and continue to generate additional $$$ and ROI."

66.   After 2003, Forest stopped conducting ROI analyses of advisory boards because of concerns about memorializing illegal intent, but the company continued to use the same types of advisory board programs as a means of inducing doctors to prescribe Celexa and Lexapro. As a Forest Area Business Director noted in a September 2003 memorandum to his Regional Directors, "[w]e are not able to do as many Ad Boards as we have in the past, so it [is] critical that we get the best targets to the programs." Similarly, in March 2004, a Texas-based Forest District Manager reported to her Regional Director and fellow District Managers that she had met with her sales team about "the types of doctors" they wanted to recruit for an upcoming advisory board and that they had come "up with 40 doctors that are either high Celexa writers or can be converted/persuaded to write

Lexapro." In August 2004, a Massachusetts District Manager wrote to his colleagues and sales team that, for an upcoming Lexapro advisory board, "we are looking for the best ROI."

**The Exceed Study**

67.     In 1998, Defendants successfully used a so-called "seeding study" - a clinical study intended to induce participating physicians to prescribe the drug under study - as part of the promotional strategy for the launch of Celexa. With the launch of Lexapro in 2002, Forest sought to replicate the success of the Celexa seeding study. Forest called the Lexapro seeding study EXCEED (EXamining Clinical Experience with Escitalopram in Depression).

68.     In the planning stages for EXCEED, a senior Forest marketing executive wrote that the purpose of the study was to ensure a "fast uptake" for Lexapro. The overall Lexapro marketing plan, which was reviewed by the company's most senior executives, stated:

> Another component of the rapid uptake of Lexapro will be to encourage trial. The experience trial for Lexapro (EXCEED) will follow approval and will be larger in scope than the Celexa experience trial (EASE). More prescribers will have the ability to trial Lexapro on several patients to gain experience. Trial leads to adoption and continued usage of a product if a prescriber has successful results.

At the conclusion of EXCEED, Forest's marketing department planned to calculate the study's "ROI," i.e., the number of prescriptions generated as compared against the cost of funding the study.

69.     To the extent the EXCEED trial had a scientific purpose, it was secondary to the purpose of inducing participating physicians to prescribe Lexapro. Forest conceived the study as a promotional tool and then sought out company scientists "to discuss possible endpoints/outcomes to look at for our early usage trial." Forest hired Covance, a contract research organization, to conduct the study, but, according to Covance's own study implementation plan, Covance, too, understood that

"the primary goal of this trial is to provide experience to physicians." Similarly, Forest openly referred to the EXCEED trial as a "seeding" study in their internal communications.

70.     Forest aimed the EXCEED study at 2,000 physicians. Under the study protocol, each participating physician could enroll up to five patients in the study, which would last eight weeks and involve three patient visits. After the first visit, the physician would fill out a one-page form with the patient's age, race, gender, and basic medical history, and Forest would pay the physician $50. After each of the next two visits, the physician would fill out an additional page requiring the physician to write the date of the visit and to check one of seven boxes describing the change, if any, in the patient's condition. After the physician completed this additional page and two other pages showing the patient's Lexapro dosing information and any adverse events or concomitant medications, Forest would pay the physician an additional $100. Forest ultimately allowed physicians to enroll up to ten patients in the study, so that physicians could make up to $1,500 for starting patients on Lexapro, plus an extra $100 if the physician dialed in to a pre-study teleconference.

71.     By the time the EXCEED study was completed, Forest had made study participation payments to 1,053 physicians, who in turn put 5,703 patients on Lexapro during the course of the study.

**Preceptorships**

72.     Between 1999 and 2003, Defendants paid millions of dollars to physicians who participated in so-called "preceptorships." Each physician who participated in a preceptorship received a "grant" of as much as $1,000 per preceptorship.

73.     Ostensibly, preceptorships were a training opportunity where sales representatives would spend a half-day or full day with a physician and learn about how Celexa and Lexapro were

used in practice. In reality, sales representatives used the preceptorships to induce physicians to prescribe Celexa and Lexapro.

74.     Defendants were fully aware of how sales representatives actually used preceptorships. Forest's company policy mandated that sales representatives fill out "Return on Investment (R.O.I.)" forms to obtain approval to pay a doctor for a preceptorship. Each ROI form provided for a statement of the amount of the payment to the physician and a projection of how many incremental prescriptions the preceptorship would cause, along with an estimate of the dollar value of those prescriptions to Forest. Thus, the preceptorship ROI forms enabled Forest to evaluate whether a payment to a participating physician was intended to induce an increase in prescriptions sufficient to justify the cost to Forest. Senior Forest sales managers and headquarters staff reviewed and approved the completed preceptorship ROI forms.

75.     The preceptorship ROI forms also provided for sales representatives to write narrative justifications for the preceptorship payments, included the following:

- "Dr. _ is the managing partner of the '__ Psychiatric Group' and is very influential among his colleagues in the _ Hospital network. He currently averages @ 12 per week on 1st RX. His #s are trending up even till this day + we need to keep a good thing going as long as we are still getting this kind of growth from Dr. _."

- "Dr. _ is the largest prescriber of SSRI's in a 3 state area.... We are currently her first line SSRI. We must, however, continue to support her monetarily or this will not continue to be the case.... We have to keep the pressure on to continue to receive the growth we are getting with Dr. _."

- "Dr. _ is my largest prescribing Celexa physician. He is a high maintenance target and doing round tables and preceptorships will help me to keep his business and to continue to grow his business."

- "2 different preceptorships. Doc is 3'd ranked phys. in SSRI potential + bus had dropped. Needed his full attention."

- "Dr. _ is my fourth largest SSRI writer.... A preceptorship will provide opportunity for rapport and for future detail time and sales."

- "# 1 physician in Territory.... Dr. _ is on the verge of writing a lot of Celexa. Will present new studies during preceptorship."

- "This full day preceptorship will give me the opportunity to sell Celexa as a first-line choice in doctor _'s practice."

- "To influence doctor to Rx Celexa."

Forest approved all of these preceptorship payment justifications.

### Lavish Entertainment And Gifts

76.    During the period from 1998 through at least 2005, each sales representative typically had a quarterly marketing budget of thousands of dollars to spend on physicians. As a Forest Regional Director put it in an April 2006 memo to his sales team, "we have a ton of promotional money." Forest sales managers put pressure on their sales representatives to spend their entire marketing budgets.

77.    Prior to 2003, Forest sales representatives commonly spent their marketing money on fishing, golf, and spa outings for physicians, and on buying tickets to sporting events and the theater for physicians. Both prior to and after 2003, Forest sales representatives also attempted to induce physicians to prescribe Celexa and Lexapro by spending their marketing budgets on restaurant gift certificates, subsidies for physician office parties, and lavish entertainment that could be disguised on an expense report as meals accompanying a supposed exchange of scientific information. Examples of these various types of kickbacks include the following:

- In 1998, a District Manager (whom Forest later named to be its nationwide Director of Compliance) arranged for sales representatives in his district to give St. Louis Cardinals tickets to physicians on the condition, he said, that the tickets be "leveraged

and sold as a reward for prescriptions" and that "A Solid Return on Investment can be demonstrated."

- In September 2002, a sales representative gave a high-prescribing child psychiatrist a $1,000 gift certificate to Alain Ducasse, a New York restaurant that at the time was one of the most expensive in the United States.

- In June 2001, two Forest sales representatives took a physician and his three sons on a deep sea fishing trip off Cape Cod, Massachusetts.

- In June 2002, a sales representative arranged a salmon fishing charter cruise for four physicians in his territory.

- In February 2002, a sales representative purchased $400 in Broadway theater tickets for a physician and his wife.

- In February 2002, a Division Manager purchased $2,276 in Boston Red Sox tickets for his sales representatives to use, he said, "throughout the next six months with all of our key targets."

- From 2001 to 2005, Forest sales representatives in North Carolina repeatedly arranged social dinners for a psychiatrist who ran multiple offices and reportedly was the highest prescriber of Celexa and Lexapro in the state.

- From 2001 to 2005, Forest sales representatives in Louisiana repeatedly paid for a physician and his family to eat at some of the most expensive restaurants in that state; one of those sales representatives reported that the physician had promised he would "always rxlex [i.e., prescribe Lexapro] #1 aslong [*sic*] as we have fun and take care of him."

78.     All of this spending was intended to induce physicians to prescribe Celexa or Lexapro.

79.     The effect of Defendants' wrongful conduct was payment by the Plaintiff and Class Members for Celexa and Lexapro prescriptions that otherwise would not have been paid for and the payment of higher prices for Celexa and Lexapro than the drugs would have commanded absent the misrepresentations and fraud on the medical and scientific community, and the third-party payors.

**False Claims Act Prosecution**

80.     In 2003 and 2005, two separate whistleblower actions against Forest were commenced under the *qui tam* provisions of the False Claims Act.

81.     An investigation was conducted by the U.S. Attorney's Office for the District of Massachusetts, the Civil Division of the U.S. Department of Justice, the Federal Bureau of Investigation, the Office of Inspector General of the Department of Health and Human Services, the Office of Criminal Investigations of the Food and Drug Administration, and the Office of Inspector General of the Department of Veteran's Affairs.

82.     The investigation revealed Forest's course of fraudulent conduct that led to the submission of false or fraudulent claims for Celexa and Lexapro to federal health care programs. These claims were not reimbursable because they were not covered for off-label pediatric use and/or were ineligible for payment as a result of illegal kickbacks.

83.     After intervening in the whistleblower actions, the United States recently filed its own Complaint in the U.S. District Court in Massachusetts.

## V. CLASS ACTION ALLEGATIONS

84.     Plaintiff incorporates by reference all proceeding paragraphs as if fully set forth herein.

85.     Plaintiff brings this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on its own behalf and as a representative of a Class consisting of all entities in the United States and its territories who, for purposes other than resale, purchased, reimbursed and or paid for Celexa and/or Lexapro during the period between 1998 through the present. For purposes of the

Class definition, entities "purchased" Celexa and/or Lexapro if they paid some or all of the purchase price.

86.     Excluded from the Class are (a) Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees, and successors, and (b) any co-conspirators.

87.     Plaintiff and the Class bring this action for equitable relief and damages pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3).

88.     Plaintiff and the Class seek a refund or reimbursement of all amounts they have expended for the purchase of Celexa and Lexapro; and, all other ascertainable economic losses and such other relief as Plaintiff and the Class are entitled to, including treble damages and reasonable attorneys' fees and costs.

89.     Plaintiff is a member of the class it seeks to represent. The Class is believed to number in the thousands. As a result, joinder of all Class members in a single action is impracticable.

90.     There are questions of law and fact common to the members of the Class, including but not limited to:

- Whether Plaintiff and the Class paid more for Celexa and Lexapro than for other equally or more effective drugs that were available at a cheaper price;

- whether children and adolescents who took Celexa and Lexapro are or were at increased risk of suicidal thinking and behavior (suicidality);

- whether, in marketing and selling Celexa and Lexapro, Defendants failed to disclose the dangers and health risks to persons ingesting the drug;

- whether Defendants failed to warn adequately of the adverse effects of Celexa and Lexapro;

- whether Defendants misrepresented in their advertisements, promotional materials and other materials, among other things, the safety and lack of dangers and health risks of Celexa and Lexapro;

- whether Defendants knew or should have known that the ingestion of Celexa and/or Lexapro leads to increased risk of suicidal thinking and behavior (suicidality) in children and adolescents;

- whether Defendants adequately tested Celexa and Lexapro prior to selling the drugs;

- whether Defendants manufactured, marketed, distributed and sold Celexa and Lexapro notwithstanding their knowledge of the drug's dangerous nature;

- whether Defendants knowingly omitted, suppressed and/or concealed material facts about the unsafe and defective nature of Celexa and Lexapro from government regulators, the medical community and/or the consuming public;

- whether Defendants engaged in a misleading and/or deceptive scheme of improperly marketing and selling Celexa and Lexapro for treatment of pediatric indications for which it is not safe or medically efficacious;

- whether Defendants engaged in a misleading and/or deceptive scheme of improperly marketing and selling Celexa and Lexapro for treatment of pediatric indications for which the drug was not lawfully approved;

- whether Defendants are liable to Plaintiff and the Class Members for damages for conduct actionable under RICO;

- whether Defendants are liable to the Class Members for damages for conduct actionable under New York's Deceptive Practices Act;

- whether Defendants are liable to the Class Members for damages for conduct actionable under various Consumer Protection Statutes;

- whether Defendants unjustly enriched themselves at the expense of Class Members;

- whether Defendants engaged in a pattern or practice that directly caused Plaintiff and Class Members to pay for Celexa and Lexapro prescriptions that were non-medically necessary uses;

- whether Defendants engaged in deceptive and/or misleading activity that directly caused Plaintiff and the Class to pay for Celexa and Lexapro prescriptions that were for non-FDA approved uses; and

- whether Defendants engaged in deceptive and/or misleading activity with the intent to defraud Plaintiff and the Class.

91.     These and other questions of law and/or fact are common to the Class and predominate over any question affecting only individual Class Members.

92.     The claims of the class representative are typical of the claims of the Class in that the named class representative and the members of the Class each paid for the prescription drugs Celexa and Lexapro or reimbursed members for the costs of the prescription due to the improper actions of the Defendants, as described herein.

93.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

94.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex class actions and products liability litigation to represent the Plaintiff and the members of the proposed Class. Accordingly, the interests of the Class will be adequately protected and advanced. In addition, there is no conflict of interest between the representative of the proposed Class and members of the Class.

95.     Maintenance of this action as a class action is a fair and efficient method for adjudication of this controversy. It would be impracticable and undesirable for each member of the Class who has suffered harm to bring a separate action. In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could result in

inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

96.     Notice can be provided to class members by using techniques and forms of notice similar to those customarily used in other drug-related products liability cases and complex class actions.

97.     Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) because the questions of law and fact common to members of the Class predominate over any questions affecting only individual members.  This class action is superior to other available remedies for the fair and efficient adjudication of this controversy.

## V.  CAUSES OF ACTION

### COUNT I: VIOLATION OF 18 U.S.C. § 1962 (c) – Off-label Marketing Enterprise

98.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

99.     Defendants are "persons" within the meaning of 18 U.S.C. §1961(3) who conducted the affairs of the enterprise, the Celexa and Lexapro Off-label Marketing, through a patterns of racketeering activity in violation of 18 U.S.C. § 1962(c).

100.    The Celexa and Lexapro Off-label Marketing Enterprise is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Defendants, Lundbeck, Intramed, Covance, Lawrence Olanoff, Ivan Gergel, Amy Rubin, The American Journal of Psychiatry, Dr. Jeffrey Bostic, and the Massachusetts Child Psychiatry Access Project at Massachusetts General Hospital.  All entities are persons within the meaning of 18 U.S.C. §1961(3) and acted to enable Defendants to fraudulently market and promote Celexa and Lexapro as scientifically proven as safe and effective for pediatric uses.  The Celexa and Lexapro Off-label Marketing Enterprise is an organization that

functioned as an ongoing organization and continuing unit. The Celexa and Lexapro Off-label Marketing Enterprise was created and/or used as a tool to effectuate a pattern of racketeering activity. Each of these entities, including Defendants, is a "person" distinct from the Celexa and Lexapro Off-label Marketing Enterprise.

101. Each of Defendants, Lundbeck, Intramed, Covance, Lawrence Olanoff, Ivan Gergel, Amy Rubin, The American Journal of Psychiatry, Dr. Jeffrey Bostic, and the Massachusetts Child Psychiatry Access Project at Massachusetts General Hospital, created and maintained systematic links for a common purpose – to enable Defendants to fraudulently represent that Celexa and Lexapro was scientifically proven as safe and effective for pediatric uses, while suppressing evidence to the contrary and improperly inducing physicians and others to increase pediatric prescriptions. Each of these entities received substantial revenue from the scheme, and these revenues were far greater than they would have been had the fraudulent acts not been undertaken. All participants were aware of the named Defendants' control over the activities of the Celexa and Lexapro Off-label Marketing Enterprise, and each part of the enterprise benefited from the existence of the other parts.

102. The Celexa and Lexapro Off-label Marketing Enterprise engaged in and affected interstate commerce, because, *inter alia*, the fraudulent activities described herein led to the marketing and sale of Celexa and Lexapro to thousands of individuals and entities throughout the United States.

103. The named Defendants exerted control over the Celexa and Lexapro Off-label Marketing Enterprise and management of the affairs of the Celexa and Lexapro Off-label Marketing Enterprise.

104.    Defendants conducted and participated in the affairs of the Celexa and Lexapro Off-label Marketing Enterprise through patterns of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), § 1512 (tampering with witnesses), and § 1952 (use of interstate facilities to conduct unlawful activity).

105.    Defendants' use of the mails and wires to perpetuate their fraud involved thousands of communications, including, but not limited to:

a.    communications with and among enterprise participants that led to the suppression and failure to timely disclose negative data and results of drug studies that called into question the safety and efficacy of Celexa and Lexapro;

b.    communications with and among the enterprise participants that fraudulently misrepresented the efficacy and safety of Celexa and Lexapro amongst themselves and others;

c.    communications with patients and Class Members, including Plaintiff, inducing payments for Celexa and Lexapro by misrepresenting the safety and efficacy of Celexa and Lexapro;

d.    receiving the proceeds in the course of and resulting from Defendants' improper scheme;

e.    transmittal and receipt of monies from consumers and third-party payors;

f.    communications with and among the enterprise participants to conceal the fraud occurring by virtue of failing to disclose the results of negative studies;

g.    communications with and among the enterprise participants to develop and implement the EXCEED trial;

h.     communications with and among the enterprise participants to develop and implement the advisory board promotional strategy;

i.     communications with and among the enterprise participants to develop and implement the ghost-writing publications strategy;

j.     communications with and among the enterprise participants for the purpose of inducing doctors to become high prescribers through various forms of illegal remuneration; and

k.     transmittal and receipt of payments in exchange for, directly or indirectly, activities in furtherance of the Celexa and Lexapro Off-label Marketing Enterprise.

106.    Defendants knew that without their fraudulent scheme, consumer and third-party payors would not have paid for Celexa and Lexapro used in the treatment of depression and other psychiatric conditions in pediatric patients. At all times during the fraudulent scheme, Defendants' and the Fraud Participants had a legal and ethical obligation of candor to and honest dealing with consumers, third-party payors, physicians and the medical community

107.    Defendants' scheme was calculated to ensure that Celexa and Lexapro was prescribed in great quantities by physicians for pediatric uses, despite the lack of FDA approval, with the knowledge of and active suppression of studies indicating safety concerns with children and juvenile patents.

108.    The conduct of the Celexa and Lexapro Off-label Marketing Enterprise described above constituted "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Defendants' decisions and activity in connection with the Celexa and Lexapro Off-label Marketing Enterprise to

routinely conduct its transactions in such a manner constitutes a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

109.    The above described racketeering activities amounted to a common course of conduct intended to deceive and harm the FDA, physicians, the public, Plaintiff and the Class. Each such racketeering activity was related, had similar purposes, involved similar or the same participants, and methods of commission, and had similar results affecting the same or similar victims, including Plaintiff and the Class. Defendants' racketeering activities were part of their ongoing business and constitute a continuing threat to the property of Plaintiff and the Class.

110.    Plaintiff and members of the Class have been injured in their property by reason of these violations in that Plaintiff and members of the Class paid hundreds of millions of dollars, if not billions, for Celexa and Lexapro that they would not have paid had Defendants not engaged in this pattern of racketeering activity.

111.    The injuries to Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity.

112.    By virtue of these violations of 18 U.S.C. § 1962 (c), Defendants are liable to Plaintiff and the Class for three times the damages sustained, plus the costs of this suit, including reasonable attorney's fees.

## COUNT II: VIOLATION OF 18 U.S.C. § 1962 (d) – RICO Conspiracy

113.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

114.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c) of this section.

115.    Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was and is to conduct or participate in, directly or indirectly, the conduct of affairs of the Celexa and Lexapro Off-label Marketing Enterprise described previously through a pattern of racketeering activity.

116.    Defendants and their co-conspirators engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, as described above.

117.    The nature of the above-described Defendants' and their co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts were and are part of an overall pattern of racketeering activity.

118.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962 (c), Plaintiff and the Class were and continue to be injured in their business and property as set forth more fully above.

119.    Defendants sought to and did engage in the commission of the following overt acts, including the following unlawful racketeering predicate acts:

a.      Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

b.      Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and 1346;

c.      Multiple instances of wire fraud violations of 18 U.S.C. §§ 1341 and 1346; and

d.      Multiple instances of unlawful activity in violation of 18 U.S.C. § 1952.

120.    Plaintiff and members of the Class were injured in their property by reason of these violations in that Plaintiff and members of the Class paid hundreds of millions, if not billions, of dollars for Celexa and Lexapro that they would not have paid had Defendants not conspired to violate 18 U.S.C. § 1962(c).

121.    The injuries of Plaintiff and members of the Class were directly and proximately caused by Defendants' racketeering activity as described above.

122.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiff and the Class for three times the damages Plaintiff and the Class have sustained, plus the costs of this suit, including reasonable attorney's fees.

## COUNT III: VIOLATIONS OF NEW YORK'S DECEPTIVE PRACTICES ACT

123.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

124.    Defendants intended that Plaintiff, the Class and the medical and scientific community would rely on their materially deceptive practices and that Plaintiff and the class would purchase or pay for Celexa and Lexapro as a consequence of the deceptive practices, including Defendants' off-label marketing and misrepresentations and omissions of material fact with respect to Celexa and Lexapro as set forth herein.  Defendants' deceptive representations and material omissions to Plaintiff and the Class were and are unfair and deceptive acts and practices.  Plaintiff and the Class were deceived by Defendants' misrepresentations. As a proximate result of Defendants' misrepresentations, Plaintiff and the Class have suffered an ascertainable loss, in an amount to be determined at trial, in that they paid millions, if not billions of dollars for Celexa and Lexapro that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

125. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. GEN. BUS. LAW § 349, *et seq.*

126. The unfair and deceptive acts and practices of Defendants have directly, foreseeably and proximately caused or will cause damages and injury to Plaintiff and the members of the Class.

127. The actions and failures to act of Defendants, including the false and misleading representations and omissions of material facts regarding the risks and the off-label use(s) for Celexa and Lexapro and the above described course of fraudulent conduct and fraudulent concealment, constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale of merchandise of Defendants in violation of the New York State's Deceptive Practices Act.

128. Physicians relied upon Defendants' misrepresentations and omissions in prescribing Celexa and Lexapro to patients. Defendants' misrepresentations and omissions caused Plaintiff and Class Members to pay for Celexa and Lexapro. By reason of the unlawful acts engaged in by Defendants, Plaintiff and the Class have suffered ascertainable loss and damages. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class were damaged by paying for these prescriptions.

129. As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

**COUNT IV: VIOLATIONS OF OTHER STATE CONSUMER PROTECTION STATUES**

130.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

131.   Defendants intended that Plaintiff, the Class and the medical and scientific community would rely on their materially deceptive practices and that Plaintiff and the class would purchase or pay for Celexa and Lexapro as a consequence of the deceptive practices, including Defendants' off-label marketing and misrepresentations and omissions of material fact with respect to Celexa and Lexapro as set forth herein.  Defendants' deceptive representations and material omissions to Plaintiff and the Class were and are unfair and deceptive acts and practices.  Plaintiff and the Class were deceived by Defendants' misrepresentations. As a proximate result of Defendants' misrepresentations, Plaintiff and the Class have suffered an ascertainable loss, in an amount to be determined at trial, in that they paid millions if not billions of dollars for Celexa and Lexapro that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

132.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARIZ. REV. STAT. § 44-1522, *et seq.*

133.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ARK. CODE ANN. § 4-88-107, *et seq.*

134.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CAL. BUS. & PROF. CODE § 17200, *et seq.*

135.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices or have made false representations in violation of COLO. REV. STAT. § 6-1-101, *et seq.*

136.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b, *et seq.*

137.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of DEL. CODE ANN. tit. 6, § 2511, *et seq.*

138.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of D.C. CODE ANN. § 28-3901, *et seq.*

139.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of FLA. STAT. ANN. § 501.201, *et seq.*

140.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of GA. CODE ANN. §10-1-392, *et seq.*

141.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of HAW. REV. STAT. § 480, *et seq.*

142.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IDAHO CODE § 48-601, *et seq.*

143.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILL. COMP. STAT. 505/2, *et seq.*

144.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of IND. CODE ANN. § 24-5-0.5-1, *et seq.*

145.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of KY. REV. STAT. ANN. § 367.110, *et seq.*

146.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of LA. REV. STAT. ANN. tit. 15, § 1401, *et seq.*

147.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of ME. REV. STAT. tit. 5, § 205-A, *et seq.*

148.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MD. CODE. ANN., COM. LAW § 13-101, *et seq.*

149.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation MASS. GEN LAWS ch. 93A, §1, *et seq.*

150.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MICH. COMP. LAWS § 445.901, *et seq.*

151.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MINN. STAT. § 8.31, *et seq.*

152.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of MO. REV. STAT. § 407.010, *et seq.*

153.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEB. REV. STAT. § 59-1601, *et seq.*

154.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of NEV. REV. STAT. 598.0903, *et seq.*

155.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. REV. STAT. ANN. § 358-A:1, *et seq.*

156.    Defendants have engaged in unfair competition or deceptive acts or practices in violation of N.J.S.A. § 56:8-1, *et seq.*

157.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. STAT. ANN. § 57-12-1, *et seq.*

158.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1, *et seq.*

159.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. CENT. CODE § 51-15-01, *et seq.*

160.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OHIO REV. CODE ANN. § 1345.01, *et seq.*

161.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or made false representations in violation of OKLA. STAT. tit. 15, § 751, *et seq.*

162.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of OR. REV. STAT. § 646.605, *et seq.*

163.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 PA. CONS. STAT. § 201-1, *et seq.*

164.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of R.I. GEN. LAWS § 6-13.1-1, *et seq.*

165.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. CODIFIED LAWS § 37-24-1, *et seq.*

166.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TENN. CODE ANN. § 47-18-101, *et seq.*

167.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of TEX. BUS. & COM. CODE ANN. § 17.41, *et seq.*

168.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of UTAH CODE. ANN. § 13-11-1, *et seq.*

169.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VT. STAT. ANN. tit. 9, § 2451, *et seq.*

170.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of VA. CODE ANN. § 59.1-196, *et seq.*

171.    Defendants have engaged in unfair competition or unfair, deceptive or fraudulent acts or practices in violation of WASH. REV. CODE § 19.86.010, *et seq.*

172.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. VA. CODE § 46A-6-101, *et seq.*

173.    Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation OF WIS. STAT. § 100.18, *et seq.*

174.    Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation OF WYO. STAT. ANN. § 40-12-101, *et seq* .

175.    Defendants intended that Plaintiff, the Class, and the medical and scientific community would rely on their materially deceptive practices and that Plaintiff and the Class would purchase or pay for Celexa and Lexapro as a consequence of the deceptive practices, including Defendants' off-label marketing and misrepresentations and omissions of material fact with respect to Celexa and Lexapro as set forth herein.  Defendants' deceptive representations and material omissions to Plaintiff and the Class were and are unfair and deceptive acts and practices.  Plaintiff and the Class were deceived by Defendants' misrepresentations. As a proximate result of Defendants' misrepresentations, Plaintiff and the Class have suffered an ascertainable loss, in an amount to be determined at trial, in that they paid millions if not billions of dollars for Celexa and Lexapro that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

176.    The unfair and deceptive acts and practices of Defendants have directly, foreseeably and proximately caused or will cause damages and injury to Plaintiff and the members of the Class.

41

177.    The actions and failures to act of Defendants, including the false and misleading representations and omissions of material facts regarding the risks and the off-label use(s) for Celexa and Lexapro and the above described course of fraudulent conduct and fraudulent concealment, constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale of merchandise of Defendants in violation of the consumer protection statutes listed above.

178.    Physicians relied upon Defendants' misrepresentations and omissions in prescribing Celexa and Lexapro to patients. Defendants' misrepresentations and omissions caused Plaintiff and members of the Class to pay for Celexa and Lexapro. By reason of the unlawful acts engaged in by Defendants, Plaintiff and the Class have suffered ascertainable loss and damages. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class were damaged by paying for these prescriptions.

179.    As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff and members of the Class are entitled to compensatory damages, treble damages, attorneys' fees and costs of this suit.

## COUNT V: UNJUST ENRICHMENT

180.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

181.    As an intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants profited and benefited from payments that Plaintiff and the Class made for Celexa and Lexapro.

182.   In exchange for the payments they made for Celexa and Lexapro and at the time they made these payments, Plaintiff and the Class expected that the drug was a safe and medically effective treatment for the condition, illness, disorder, or symptom for which it was prescribed.

183.   Defendants voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of their wrongdoing, Plaintiff and the Class paid for Celexa and Lexapro when they otherwise would not have done so and paid for the drug at a higher price than they would have paid but for the Defendants' wrongful conduct.

184.   Plaintiff and the Class are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent and in the amount, deemed appropriate by the Court and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff and the Class demand judgment against Defendants in each claim for relief, jointly and severally, as follows:

a)   For an order certifying this matter as a class action as requested herein and a declaration that this action is a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing an appropriate class or classes and finding that the Plaintiff and its counsel are proper representatives of the class;

b)   For an Order appointing the undersigned counsel as Class counsel;

c)   On Plaintiff's and the Class's RICO claims, compensatory damages, and enhancement of damages Plaintiff and the Class have sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such amount to

43

be determined at trial, plus Plaintiff's costs in this suit, including reasonable attorneys' fees.

d)      On Plaintiff's and the Class's Consumer Fraud Act claims, compensatory damages, and enhancement of damages Plaintiff and the Class have sustained as a result of Defendants' conduct as may be permitted under the relevant statutes, such an amount to be determined at trial, plus Plaintiff's costs in this suit, including reasonable attorneys' fees;

e)      On Plaintiff's and the Class's claim for unjust enrichment, recovery in the amount of Plaintiff's and the Class's payment for Celexa and Lexapro, such amount to be determined at trial, plus Plaintiff's costs in this suit, including all reasonable attorneys' fees;

f)      For an order otherwise requiring Defendants to refund and make restitution of all monies acquired from the sale of Celexa and Lexapro to Plaintiff and the Class;

g)      Awarding Plaintiff and the Class prejudgment interest on all damages;

h)      Awarding Plaintiff and the Class other appropriate equitable relief;

i)      Awarding Plaintiff and the Class their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees; and

j)      Awarding Plaintiff and the Class all such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: March 12, 2009

Respectfully submitted,

**Murray Law Firm**

Justin Bloom, JB-3156
James R. Dugan, II
Douglas R. Plymale
Murray Law Firm
650 Poydras Street, Suite 2150
New Orleans, LA   70130
Telephone:  (504) 648-0180
Fax:  (504) 648-0181

Shane Youtz
YOUTZ AND VALDEZ, PC
420 Central SW, Suite 210
Albuquerque, New Mexico  87102
Telephone: (505) 244-1200
Fax: (505) 244-9700

**ATTORNEYS FOR PLAINTIFFS**